## CHARTER LEASE/VESSEL PURCHASE AGREEMENT

This Charter Lease/Vessel Purchase Agreement (the "Agreement") made as of this __20th__ day of March 2018 by and between Cashman Equipment Corp. a company duly organized and existing under the laws of the Commonwealth of Massachusetts with a principal business address of 41 Brooks Drive, Suite 1005 Braintree, Massachusetts 02184 hereinafter referred to as "CEC" and EMCS Caribbean LTD. a company duly organized and existing under the laws of _The British Virgin Islands_ with a principal business address of HR Penn Bldg., Suite #3, Macnamara Tortola, BVI, hereinafter referred to as "EMCS"

### WITNESSETH:

**WHEREAS,** Cashman Equipment Corp. is the Owner of the Deck Cargo Barge JMC 50, a US Registered Vessel official number 1069223 and it's appurtenances to include 5' bin walls and 34' x 14' or larger ramp aboard:

**WHEREAS,** CEC desires to charter and/or sell the Vessel to EMCS upon the terms and conditions set forth herein; and

**WHEREAS,** EMCS desires to charter and/or acquire the Vessel upon the terms set forth herein.

**NOW, THEREFORE** in consideration of the mutual promises and covenants contained herein and for all other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. EMCS and CEC hereto represent and agree as follows:

### AGREEMENT
### Part 1 - Bareboat Charter

1. CEC hereby agrees to charter to EMCS, and EMCS agrees to hire from CEC the Vessel known as JMC 50 Official # 1069223 and it's appurtenances belonging (hereafter collectively referred to as the "Vessel" (the "Charter"). The Charter at all times shall be considered a Bareboat or Demise Charter with Charterer acting in the capacity of *Owner Pro Hac Vice* of the Vessel from the date forward until the termination of the Charter Party.

2. The first 30 days of charter hire is due in advance with the signing of this agreement.

3. The Charter Hire shall be US$1300.00 per day without set off commencing 00:01 on the date following the completion of the on hire survey which will take place upon completion of the installation of the binwalls and ramp. In addition, EMCS shall pay CEC a non-refundable deposit of US$25,000.00 covering the installation of the binwalls and ramp, which will be credited toward the Charter Hire. Any applicable taxes are to be for EMCS's account. The term is 6 months firm period. Thereafter, while the Vessel remains in the possession of EMCS this agreement shall continue until possession of the Vessel is tendered by EMCS and accepted by CEC. Charter Hire and related costs shall be invoiced by CEC monthly in advance with payments due upon receipt. Amounts invoiced and

---

Initials CEC _M_          Initials EMCS _NW_          Page 1

EXHIBIT

1

exhibitsticker.com

outstanding in excess of 15 days shall accrue interest at the rate of 1.5% per month (pre and post judgment). The prompt payment of monthly charter hire payments is a material element of this agreement and EMCS warrants that it will make each monthly payment no later than the 20th day of each month.

4.    EMCS shall provide CEC with a security deposit in the amount of US$500,000.00.

5.    Possession of the Vessel shall vest in EMCS immediately upon the commencement of this Agreement (section 3). The Vessel shall be picked up at off Eugene Island Sea Bouy. Notwithstanding paragraph 10 below, upon delivery of the Vessel to EMCS all risk of loss to the Vessel (INCLUDING THE RISK OF MECHANICAL FAILURE OF VESSEL MACHINERY AND APPURTENANCES) transfers from CEC to EMCS.

6.    CEC warrants that at the time of execution of this Agreement that:

      a) CEC has the right to possess and charter the Vessel to EMCS.

      b) The Vessel is documented with the US Vessel Registry.

      c) The Vessel is in full class status with current class.

7.    EMCS may during the firm period, install additional equipment aboard the Vessel reasonably necessary in connection with its operations, provided that EMCS shall obtain the written consent of CEC before making any structural changes, modifications, or installations and provided that said installation shall be approved by the American Bureau of Shipping when applicable. All equipment installed by EMCS shall not be removed prior to redelivery.

8.    EMCS has inspected the Vessel and found it to be in acceptable condition for its intended use, and in every respect seaworthy, and delivery of the vessel to EMCS shall constitute full performance by and compliance with all express or implied obligations and warranties (including a warranty of seaworthiness) of CEC. No claim shall exist in favor of EMCS on account of any representations or warranties with respect to said vessel.

Moreover EMCS stipulates that CEC makes no representations or warranties as to the suitability of the Vessel (and its appurtenance) for EMCS's intended purpose. At all times, it shall be EMCS's duty to determine seaworthiness and suitability of the Vessel.

To the extent necessary, EMCS's acceptance of the Vessel constitutes a knowing and voluntary waiver of any and all warranties, whether implied or express, including seaworthiness and all others, in any way related to the Vessel.

9.    EMCS shall at its own cost and expense operate and supply the Vessel.

10.   Upon termination of this Agreement, the Vessel shall be delivered to CEC in like good order and condition as when received, at CEC's yard in Amelia, Louisiana (or elsewhere

---

Initials CEC           Initials EMCS HCP          Page 2

by mutual agreement) and the Charter Hire shall continue until such redelivery to CEC's yard in Amelia, Louisiana at which time Charter Hire shall cease.

11. The term "wear and tear" as used herein shall mean the wear and tear which would normally be expected to occur during the careful, proper and prudent use of the Vessel over the period of time involved, assuming proper maintenance and compliance with the other terms of this Agreement.

   a) EMCS agrees to pay for all repairs and maintenance necessary to maintain the Vessel in the same condition as at delivery.

   b) CEC shall cause Stansbury & Associates LLC of 607 Roderick Street, Morgan City, Louisiana (stansburty-associates@teche.net) as the independent third party surveyor agreed to by both parties to conduct an on-charter survey prior to possession of the Vessel by EMCS, and thereafter for an off-charter survey to be conducted at the time of physical redelivery of the Vessel to CEC. Charges for said surveys shall be shared equally between parties. It is agreed by both parties that the said survey shall be conclusive proof as to the change in condition, if any, sustained by the Vessel during the time of this charter. EMCS to remove all weldments flush to deck and paint such areas to CEC's satisfaction.

   c) In the event of a change in condition greater than wear and tear is noted by the surveyor, then it shall be the EMCS's duty to: (i) restore the Vessel or cause the Vessel to be restored at its own cost; and (ii) pay the Charter Hire until the Vessel is either restored to the CEC's satisfaction or is placed back into charter service by the CEC. Failure to comply with the requirements of sub-clause (i) of this paragraph within a reasonable period following notification of required restoration will authorize CEC to perform said restoration or cause the restoration of the Vessel to be made as EMCS's agent and to recover the full cost of same from EMCS.

   d) The cost of said restoration shall be payable by EMCS immediately upon presentation to it of the restoration invoice.

   e) In the event CEC performs restoration or causes restoration to be performed by others on the Vessel, then there shall arise a presumption in favor of CEC as to the reasonableness of the restoration invoice subject always to the ability of EMCS to prove the unreasonableness of said invoices.

12. It is further understood and agreed that in the event a change in condition is noted as per this numbered paragraph, then physical redelivery of the Vessel by EMCS shall not constitute acceptance of Vessel by CEC nor a release or termination of EMCS's obligation hereunder to restore the damage and pay Charter Hire. Provided that in case of constructive total loss, Charter Hire shall cease from the date a determination is made by

CEC, EMCS, and respective underwriters that the Vessel is to be considered a constructive total loss. EMCS shall not have authority to permit or incur a lien or levy against the Vessel and EMCS shall not suffer nor permit to be continued any lien or levy against the Vessel except for a salvage lien.

13. EMCS warrants that the Vessel shall be employed only in suitable, safe, lawful trade and operations, and will not be navigated nor used in any improper or negligent manner for its proposed purpose. EMCS further warrants that the Vessel will be employed only between and at safe and permissible ports, places, berths, or anchorages where she can be always be safely afloat, and within the navigation limits of the applicable insurances.

14. EMCS shall in the use and operation of Vessel comply with all applicable Federal, State, Municipal, and local laws and with the rules, orders, regulations, directives, and requirements of any department, commission, and bureau, and with all local ordinances and regulations.

15. EMCS shall be liable for the assessment of any city/town, parish/county, and state ad valorem tax assessed against the Vessel as a result of EMCS's use of the Vessel in any location.

16. EMCS warrants that it shall procure and maintain in full force and effect, for its account for the duration of this Charter Hire. insurance as follows:

   a) Hull and Machinery insurance in an amount of $2,000,000.00 on the American Institute Hull Clauses January 18, 1970 or equivalent with navigation limits adequate for vessel's trade. and subject to a deductible not to exceed $25,000.00.

   b) Protection & Indemnity Insurance in the amount of $5,000,000.00 (Form SP-23 or equivalent), including wreck removal, cargo, master and crew, and employees of EMCS and employees of EMCS's co-lessees, subcontractors, and others working for EMCS, with same navigation limits as Hull and Machinery Insurance, subject to deductible not to exceed $25,000.00.

   c) As may be required by the Water Quality Improvement Act of 1970 or by any other federal, state, municipal or local law or regulation, as amended or supplemented, insurance to cover pollution liability (including but not limited to clean-up liability), to statutory limits, and any liability for damages caused by pollution, with limits of not less than $5,000,000.00 per occurrence.

All policies shall name CEC and any additional parties designated by CEC, as additional assureds, as loss payee, and contain a waiver of subrogation in favor of CEC. Copies of the original policies shall be held by CEC and its assigns and a provision requiring 15 days' notice to all assured from insurers prior to cancellation or substantial modification of said policies by the insurers. All deductibles in above policies are to be for EMCS's account.

17. During the Charter Hire, EMCS shall release, protect, defend and indemnify and hold harmless CEC, its parent, subsidiary, and/or affiliated companies and their respective

employees, servants, contractors, sub-contractors, agents and invitees against any and all claims, demand, liabilities and causes of action of every kind and character, arising directly or indirectly out of the management, operation, navigation, and/or condition of the Vessel, including but not limited to loading and unloading of personnel, cargo, and property on the Vessel in favor of any person and/or entity on account of personal injuries and/or death of EMCS's employees, servants, contractors, sub-contractors, agents and invitees and any other non-crew members aboard the Vessel.

18. During the Charter Hire, EMCS shall release, protect, defend, indemnify, and hold harmless CEC, its parent, subsidiary, and/or affiliated companies and their respective employees, servants, contractors, sub-contractors, agents and invitees for any damage cause to the vessel by EMCS or any third parties.

19. <u>Indemnification of EMCS by CEC.</u> CEC hereby agrees to pay and assume liability for and does hereby agree to indemnify, defend, protect, save and keep harmless EMCS and the Vessel from and against any and all liabilities, obligations, losses, damages, penalties, claims (including claims by any employee of CEC or any of its servants, crew or agents), actions, suits, and related costs, expenses and disbursements, including reasonable legal fees and expenses, of whatsoever kind and nature imposed on, asserted against or incurred by EMCS or the Vessel, in any way relating to or arising out of or alleged to be attributable to, related to or arising out of (i) any breach of any representation or warranty of CEC of this Agreement or any breach or non-fulfillment of any covenant or agreement of CEC as set forth in this Agreement; or (ii) Encumbrances arising as a matter of law from events solely related to CEC's Ownership of the Vessel prior to the Closing.

20. <u>Indemnification of CEC by EMCS</u>. EMCS hereby agrees to pay and assume liability for, and does hereby agree to indemnify, defend, protect, save and keep harmless CEC from and against any and all liabilities, obligations, losses, damages, penalties, claims (including claims by any employee of EMCS or any of its servants, crew or agents), actions, suits and related costs and expenses and disbursements, including reasonable legal fees and expenses, of whatsoever kind and nature, imposed on, asserted against, or incurred by CEC or the Vessel in any way relating to or arising out of or alleged to be attributable to, related to or arising out of (i) any breach of any representation or warranty of EMCS in this Agreement or any breach or nonfultillment of any covenant, agreement or other obligation of EMCS as set forth in this Agreement; or (ii) Encumbrances arising as a matter of law from events solely related to EMCS's ownership or operation of the Vessel after the Closing.

21. <u>Survival of Indemnities</u>. Notwithstanding the termination of this Agreement, the indemnities and hold harmless obligations provided herein shall survive the purchase of the Vessel contemplated by this Agreement and the termination of the Agreement and shall continue in full force and effect for applicable claims or causes of action arising during the term of this Agreement and before the Closing until the expiration of the

applicable statute of limitations in respect to claims of that type.

22.   All sales or use taxes imposed on this rental or purchase, if any, are the responsibility of EMCS and EMCS undertakes to indemnify CEC from payment of same.

23.   The parties agree that notices of and from one to the other shall be sent to the following addresses:

> CEC:  Cashman Equipment Corp.
>         41 Brooks Drive, Suite 1005
>         Braintree, MA 02184

> EMCS:  EMCS Caribbean LTD.
>          HR Penn Bldg., Suite #3
>          Macnamara Tortola, BVI

The validity and interpretation of this Agreement and the rights and obligations of the parties hereto shall be governed in all respects by the laws of the Commonwealth of Massachusetts, without giving effect to the conflicts of law provisions thereof.

24.   Any controversy or claims arising out of or relating to this contract or the breach thereof shall be governed by the general maritime law of the United States, insofar as applicable, otherwise by the laws of the Commonwealth of Massachusetts. The parties to this contract hereby agree that all disputes shall be resolved in the first instance by the United States District Court for the District of Massachusetts and in default of subject matter jurisdiction in said court then in a court of general jurisdiction in the Commonwealth of Massachusetts. All parties waive any defense of lack of personal jurisdiction or defense of improper venue associated with said forum selection method as described herein. Notwithstanding the foregoing, CEC retains the right to initialize proceedings pursuant to the Supplemental Rules of Admiralty Procedures in any forum in order to enforce its contractual rights therein. Both parties specifically waive and disclaim any right to claim of seek consequential damages which may arise out of a breach of this agreement.

25.   In the event of a dispute arising out of the interpretation or enforcement of any term of this agreement, which dispute is referred by either party hereto to an attorney for resolution, the prevailing party shall be entitled to collect its full costs, including attorney's fees expended in connection therewith whether or not litigation is actually commended.

26.   Any provision of this Agreement which in unenforceable, in whole or in part in any jurisdiction, shall as to such jurisdiction, be ineffective only to the extent of such unenforceability without invalidating any remaining part or other provision hereof. Any provision of this Agreement which is unenforceable, in whole or in part, in any jurisdiction shall not be affected in any manner by reason of such enforceability in any other jurisdiction.

27. This Agreement constitutes the entire agreement between CEC and EMCS. CEC and EMCS agree that this Agreement shall not be amended, altered or changes except by a written agreement signed by the parties hereto.

28. Any notice required to be given hereunder shall be deemed adequately given if sent by electronic mail or a nationally recognized over-night courier service, to the other party at their respective address stated herein or at such other place as either may designate in writing to the other, or by electronic mail set forth in Paragraph 23 hereof.

29. This Agreement may he executed in one or more counterparts if electronically received by both parties within 2 days of each other. Each of which shall be deemed an original, but all such counterparts together shall constitute one and the same instrument.

30. This contract is binding upon CEC and EMCS, their heirs, executors, or assigns, as soon as executed by both parties hereunto.

31. EMCS and CEC shall each pay their own out-of-pocket fees and expenses, including, without limitation, all legal, advisory or other fees and expenses, arising in connection with any transactions contemplated by this Agreement.

32. CEC and EMCS hereby represent and warrant each to the other that neither has contacted or dealt with any broker, agent, dealer, finder or other party in connection with the transactions contemplated by this Agreement by whom any commission or other fees may be claimed, asserted, due or payable.

### Purchase Option
### Part II

33. CEC grants the option to EMCS to purchase the Vessel (the "Option"") at any time during the 6 month firm period under the following terms and conditions:

34. Purchase price for the Vessel shall be One Million Six Hundred Thousand Dollars (US$1,600,000.00) (the "Purchase Price").

35. If EMCS chooses to purchase the Vessel (pursuant to the option), EMCS shall deliver the Balance of the Purchase Price to CEC and CEC shall cause the transfer of the ownership of the Vessel to be delivered to EMCS. EMCS and CEC each shall provide the other documents, certificates, and instruments required to be delivered pursuant to Section 37 & 38.

36. The Vessel, free of charter and average and free and clear of all liens and encumbrances, shall be conveyed to the EMCS at the Closing.

37. <u>Deliveries by EMCS</u>. At the Closing, EMCS will deliver or cause to be delivered:

   a) The Balance of the Purchase Price (as determined by Section 39) by wire transfer of immediately available funds to the account of CEC.

    b)  Certificate of Acceptance and Delivery (in the form attached hereto): and,

    c)  Limited Liability Resolution authorizing the purchase.

38.   <u>Deliveries by CEC</u>.  At the Closing, CECSMS will deliver or cause to be delivered:

    a)  A US Coast Guard bill of sale executed by CEC, as appropriate pursuant to which CEC shall transfer, or cause to be transferred to EMCS all right, title and ownership of the Vessel free and clear of all Encumbrances (as hereinafter defined),

    b)  Limited Liability Resolution authorizing the sale.

39.   The Balance of the Purchase Price shall be calculated by the following formula: Purchase Price of US$1,600.000.00 less Recognizable Charter Hire Payments as determined by section 39.

40.   Recognizable Charter Hire Payments shall be an amount equal to one hundred percent (100%) of eligible Charter Hire payments (made strictly in compliance with the requirements of section 3 of this agreement) if and only if the Balance of Purchase Price is received by CEC on or before the 180th day of the charter period.

41.   The Option is not subject to any inspection of the Vessel or its records, except EMCS shall have the right to obtain a title examination of the Vessel prior to the Closing.

42.   The Vessel is being sold and purchased, in its absolute current condition, AS IS- WHERE IS as of the date of this agreement, without any warranties, or representations, express or implied, as to its condition, merchantability, fitness for any particular purpose, seaworthiness, or qualification for classifications or certification.  Other than the warranty of title, any warranties and/or representations (as the case may be), either expressed or implied are explicitly disclaimed by EMCS and disavowed by CEC.

SIGNATURES ON NEXT PAGE

**IN WITNESS WHEREOF,** the parties hereunto have placed their hands and seals on the day and year first above written.

Witness

CASHMAN EQUIPMENT CORP.

BY

Name: Daniel E. Schwall

Initials CEC

Initials EMCS

Title: _S.V.P_____

_____
Witness

EMCS CARIBBEAN LTD.

BY_____
Name: _Nervin O. Wheatley_____
Title: _Managing Director_____

EXHIBIT "A"

## CERTIFICATE AND DELIVERY ACCEPTANCE

Concerning a certain Vessel Purchase Agreement dated _May 9th_ 2018

Cashman Equipment Corp., hereinafter called "CEC" and  EMCS Caribbean LTD., hereinafter called "EMCS",

DO HEREBY CERTIFY:

that at _____ hours on the _____ day of _____, 2018, which such Vessel was located at_____, EMCS accepted from CEC delivery of the vessel JMC 50, at which time (i) title to and (ii) risk of loss and/or damage, to the JMC 50 transferred to EMCS from CEC, in accordance with the Charter Lease/Vessel Purchase Agreement between the parties dated _____, 2018.

IN WITNESS WHEREOF, CEC and EMCS have caused their duly authorized representatives to execute this certificate on this _____ day of _____, 2018.

For CEC:                                     CASHMAN EQUIPMENT CORP.


Witness_____      By: _____

For EMCS:                                  EMCS CARIBBEAN LTD.

Witness: _____       By: _____

EXHIBIT
2
exhibitsticker.com

5:03 PM
02/01/22

**Cashman Equipment Corp.**
**Bills for TRINITY OFFSHORE SUPPLY & TOW LIMITED**
All Transactions

| Type | Num | Date | Due Date | Aging | Amount | Open Balance |
|------|-----|------|----------|-------|--------|--------------|
| Bill | 898 | 02/01/2022 | 02/11/2022 | | 7,750.00 | 7,750.00 |
| Bill | 887 | 01/04/2022 | 01/14/2022 | 18 | 7,750.00 | 7,750.00 |
| Bill | 880 | 12/01/2021 | 12/11/2021 | 52 | 7,500.00 | 7,500.00 |
| Bill | 864 | 11/01/2021 | 11/11/2021 | | 7,750.00 | |
| Bill | 855 | 10/04/2021 | 10/14/2021 | | 7,500.00 | |
| Bill | 842 | 09/01/2021 | 09/11/2021 | | 7,750.00 | |
| Bill | 838 | 08/03/2021 | 08/13/2021 | | 7,750.00 | |
| Bill | 829 | 07/02/2021 | 07/12/2021 | | 7,500.00 | |
| Bill | 821 | 06/01/2021 | 06/11/2021 | | 7,750.00 | |
| Bill | 802 | 04/30/2021 | 05/10/2021 | | 7,500.00 | |
| Bill | 787 | 04/01/2021 | 04/11/2021 | | 7,750.00 | |
| Bill | 772 | 03/02/2021 | 03/12/2021 | | 7,000.00 | |
| Bill | 761 | 02/01/2021 | 02/11/2021 | | 7,750.00 | |
| Bill | 749 | 01/05/2021 | 01/15/2021 | | 7,750.00 | |
| Bill | 727 | 11/30/2020 | 12/10/2020 | | 7,500.00 | |
| Bill | 721 | 10/31/2020 | 11/10/2020 | | 7,750.00 | |
| Bill | 711 | 10/01/2020 | 10/11/2020 | | 7,750.00 | |
| Bill | 701 | 09/02/2020 | 09/12/2020 | | 7,500.00 | |
| Bill | 690 | 08/03/2020 | 08/13/2020 | | 15,000.00 | |
| Bill | 685 | 07/13/2020 | 07/23/2020 | | 3,500.00 | |
| Bill | 687 | 07/13/2020 | 07/23/2020 | | 15,000.00 | |
| Bill | 686 | 07/13/2020 | 07/23/2020 | | 10,500.00 | |
| **Total** | | | | | **181,250.00** | **23,000.00** |

# TRINITY OFFSHORE SUPPLY & TOW LIMITED

## Tax Invoice

VAT Reg. No. 3070...

OTAHEITE INDUSTRIAL PARK
SOUTH OROPOUCHE

Tel: 677-5442
Fax: 677-4125

| Invoice No. | Date: |
|---|---|
| **898** | 2/2/22 |

Page    1

Sold To:
CASHMAN EQUIPMENT CORP
60 Brooks Drive,
Ste 1005, Braintree,
Massachusetts
USA 02184

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| CAS01 | | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | | | 3/4/22 |

| Qty | Vehicle No. | Job Description | Rate | Amount - USD |
|---|---|---|---|---|
| 31.00 | | TO: INVOICE FOR THE STORAGE OF -<br>MV. "JMC 50 BARGE" LOCATED AT<br>CHAGUARAMAS ANCHORAGE, TRINIDAD<br>DURING THE PERIOD -<br>1ST JANUARY , 2022 TO 31ST JANUARY, 2022.<br>TOTAL NO OF DAYS = 31.<br>.<br>.<br>REFER: E MAIL DATED JULY 29, 2020.<br>.<br>.<br>DAYS @ DAILY RATE OF USD$250.00 PER DAY.<br>.<br>.<br>PAYMENT BY WIRE TRANSFER AS PER<br>ATTACHED INSTRUCTIONS.<br>ALL FIREIGN BANK CHARGES FOR C.E.C.<br>ACCOUNT. | 250.00 | 7,750.00 |

Thank you for your business

Signature:



| | |
|---|---|
| Subtotal | 7,750.00 |
| Sales Tax | |
| Total Invoice Amount | 7,750.00 |
| Payment Received | |
| **TOTAL US$** | 7,750.00 |

EXHIBIT

3



# TRINITY
## OFFSHORE SUPPLY & TOW LTD

Otaheite Industrial Park,
South Oropouche, Trinidad & Tobago
Tel: (868) 677-6625 / 5442
Fax: (868) 677-4125
Email: info@trinitytt.com
Website: www.trinitytt.com

## **WIRING INSTRUCTIONS**

INTERMEDIARY BANK:

FW 026 009 593
BANK OF AMERICA
100 WEST 33RD STREET
NEW YORK
NEW YORK 10001
USA

SWIFT ADDRESS:

BOFAUS3N

ACCOUNT WITH INSTITUTION:

REPUBLIC BANK LTD
FOREX TRINIDAD

SWIFT ADDRESS:

RBNKTTPX

ACCOUNT NO:

021110231401CHQ

BENIFICIARY/CUSTOMER:

TRINITY OFFSHORE SUPPLY & TOW
LTD

BENEFICIARY ADDRESS:

OTAHEITE INDUSTRIAL PARK
SOUTH OROPOUCHE,
TRINIDAD AND TOBAGO



Directors: C. A. Brash (Chairman), David Brash (Managing Director) C. A. Brash, Daniel Brash

**From:** Jamie Cashman
**Sent:** Monday, July 13, 2020 1:06 PM
**To:** Ray Riddle
**Subject:** Fwd: Proforma Invoice for JM50 movement and storage

FYI

Sent from my iPhone

Begin forwarded message:

[Quoted text hidden]

---

**Michael Brash** <mbrash@trinitytt.com>                                    Mon, Jul 13, 2020 at 1:47 PM
To: Ray Riddle <riddle@4barges.com>
Cc: Accounts Payable <accountspayable@4barges.com>, Jamie Cashman <jcashman@4barges.com>,
"dbrash@trinitytt.com" <dbrash@trinitytt.com>, "sales@trinitytt.com" <sales@trinitytt.com>

Got it, thanks!

[Quoted text hidden]

---

**Ray Riddle** <riddle@4barges.com>                                    Wed, Jul 29, 2020 at 4:05 PM
To: Michael Brash <mbrash@trinitytt.com>
Cc: Accounts Payable <accountspayable@4barges.com>, Jamie Cashman <jcashman@4barges.com>,
"dbrash@trinitytt.com" <dbrash@trinitytt.com>, "sales@trinitytt.com" <sales@trinitytt.com>

Michael,

Thank you for taking my call.   As discussed, I have a legal responsibility to mitigate costs that will ultimately be
passed on to the other party.   So to that end, we agreed that Cashman will pay $500 per day through today and
$250 from this day forward.   Cashman will continue to get billed in arrears, but instead of on a monthly basis, we will
be billed on bi-monthly.

*from   30/7/2020.*

Cheers,

*Ray Riddle*

**SVP, Finance, Legal & Administration**

Cashman Equipment Corp & Affiliates

60 Brooks Drive, Braintree, MA 02184

[Quoted text hidden]

---

**Michael Brash** <mbrash@trinitytt.com>                                    Wed, Jul 29, 2020 at 9:49 PM
To: Ray Riddle <riddle@4barges.com>

# A & M DOCKSIDE REPAIR, INC.
## P.O. BOX 1096, AMELIA, LA 70340
### PHONE: (985)631-9018 FAX: (985)631-2588
### amdockside@att.net

Cashman

November 22, 2021

ATTN: Jamie Guy

Ref:  Steel Price

Price of barge repair is $8.50 lb. due to recent increasing for new steel purchase.

If you have further questions, please contact Chad Gary at (985) 631-9018.

Respectfully,

Chad Gary
A&M Dockside Repair, Inc.

**EXHIBIT**

4

**From:** Jamie Guy
**Sent:** Thursday, July 09, 2020 1:40 PM
**To:** Dan Schwall
**Cc:** Ray Riddle
**Subject:** Re: Inv TSU.20.163 JMC 50.pdf

Looking at the deck inside of the walls, you have approximately 200,000 lbs of steel in just the deck plating. East coast pricing versus GOM will differ dramatically. I don't believe by looking at the pictures that the whole deck would be a problem, but that's just from the pictures.GOM prices for a job of this size could range from 5.00/lb to 7.00/lb.  East coast would range from 7.00 to 10.00 per pound. That being said your between 1-2 million worst case scenario. Once again I don't know the exact extent of the damage. Hopefully this gives you something to work with. If you need anything else give me a call.
Thanks

Jamie Guy
Sent from my iPhone

On Jul 9, 2020, at 12:05 PM, Dan Schwall <dschwall@4barges.com> wrote:

> Ray,
>
> Talking to Jamie Guy, he thinks the cost will be more like $10/lb.

1

**EXHIBIT**

**5**



# CONDITION AND VALUATION SURVEY REPORT





| Name of Vessel: | JMC 50 |
|---|---|
| Vessel Type: | Barge |
| IMO/ Registration No.: | Deck Barge |
| Job Number: | TSU-21-0102 |
| Purpose: | Owner's Request |
| Place of Inspection: | Chaguaramas, Trinidad |
| Date of Inspection: | 29th May 2021 |
| Inspector: | C. Lange |

### REVISION HISTORY

| Revision | Date | Description |
|---|---|---|
| 0 | 06/06/21 | Final Version |

**EXHIBIT**

**6**



# Table of Contents

VESSEL PARTICULARS .......................................................................................................... 3

   CERTIFICATION .............................................................................................................. 3

EXECUTIVE SUMMARY STATEMENT ................................................................................. 3

VALUATION ............................................................................................................................. 4

REMARKS ................................................................................................................................. 4

GENERAL DESCRIPTION ...................................................................................................... 5

   TOWING BRIDLE ......................................................................................................... 5

   MAIN DECK ................................................................................................................... 5

   FORWARD RAKE AND TRANSOM PLATING ......................................................... 6

   FORWARD AND AFT DECKS .................................................................................... 6

   STARBOARD HULL CONDITION ............................................................................. 6

   PORT HULL CONDITION ........................................................................................... 6

   HEAD LOG ..................................................................................................................... 7

   ANCHORING AND MOORING EQUIPMENT ........................................................... 7

   MANHOLE COVERS .................................................................................................... 7

   BINWALLS AND GUARD RAILS .............................................................................. 7

   INTERNAL CONDITION OF TANKS ......................................................................... 8

   PLATING DAMAGE .................................................................................................... 11

REPORT ATTACHMENTS .................................................................................................... 11

# VESSEL PARTICULARS

| | |
|---|---|
| **Vessel Type:** | Deck barge with bin walls |
| **Flag:** | United States of America |
| **Port of Registry:** | Amelia, Louisiana |
| **Official#:** | 1069223 |
| **Length:** | 211.20ft |
| **Breadth:** | 60ft |
| **Depth:** | 14ft |
| **Gross Tonnage:** | 1366 |
| **Hull Material:** | Steel |
| **Year of Build:** | 1998 |
| **Builder:** | Corn Island Shipyard, Inc |
| **Hull #:** | 144 |
| **Owner:** | Cashman Equipment Corporation |
| **Construction Classification:** | ABS *A1 |

## CERTIFICATION

| | ISSUED BY | EXPIRY | REMARKS |
|---|---|---|---|
| USCG Certificate of Documentation | USCG | 31/03/2022 | Sighted |
| Certificate of Classification | ABS | 16/04/2023 | Surveys Overdue |
| International Load Line Certificate | ABS | 16/04/2023 | Surveys Overdue |
| International Oil Pollution Prevention Certificate | ABS | 16/04/2023 | Surveys Overdue |

**REMARKS:** Vessel's last dry docking was noted to be 18th April 2018 therefore it is now in overdue status which requires that the barge be immediately placed on dry dock for inspection by the American Bureau of Shipping (ABS). Several Conditions of Class relating to corroded bottom longitudinals and plating were stated as overdue by the American Bureau of Shipping (ABS) in their survey status report attached in **Annex 10** which required rectification before 16th July 2020. Due to the laid up status of the vessel for the past year immediate rectification of these repairs on dry dock can now be considered critical for the vessel to be considered safe and seaworthy.

# EXECUTIVE SUMMARY STATEMENT

The barge JMC 50 was generally considered to be in fair condition however there were clear indications of accelerated steel corrosion and wastage, particularly with respect to bin wall steel structures and bridle chain arrangements. The excessive hull corrosion evident, in addition to the outstanding conditions imposed by the Classification Society ABS require urgent rectification of all structural defects noted herein inclusive of dry docking. The vessel has not been inspected on dry dock for the past 3 years therefore it would be reasonable to assume that all hull zinc anodes are depleted resulting in the accelerated corrosion observed. Consequently, the undersigned strongly advises that the owners Cashman Equipment Corporation as stated in the USCG Certificate of Documentation for registry take urgent and immediate action to ensure the barge is dry docked and necessary repairs to its structure dealt with.

Based on the present condition of the barge, as described herein below, it is also recommended that additional preventative actions be implemented, which should include but not be limited to, sounding of all tanks to verify no water ingress is taking place, replacement of the severely corroded wasted and partly submerged bridle chains, and welded steel repair of the wasted towing bridle connections to the bow deck plating. The repairs to the bridle chain and its connections are of extreme importance for ensuring safe towage of the barge whenever necessary, therefore should be considered for immediate action.   It is anticipated that the owners Cashman Equipment Corporation shall be obligated to return the barge to the United States for dry docking inspection and repairs under the supervision of The American Bureau of Shipping (ABS) for recertification.  Forecasted deterioration of weather conditions as the current hurricane season continues must also be considered with the barge currently anchored in confined and shallow waters and a potential threat to the safety of navigation to other vessels.

## VALUATION

For valuation purposes, "as is where is" considers required repairs for the vessel on dry dock as mandated by ABS,  estimated to conservatively cost approximately US$800,000.00 and the cost of towage expenses to its homeport in Louisiana USA of approximately US$300,000.00 to negatively impact its current market value.

Consequently this serves to confirm, that in the opinion of the undersigned inspector without prejudice, the vessel "**JMC 50**" was considered to have an, "as is, where is", value inclusive of hull, machinery and ancillary equipment, of **Four Hundred and Fifty Thousand United States Dollars (US $450,000.00)**.

## REMARKS

Latent defects not to be found without opening or removal of sheathing, joiner work, deck covering and/or the disassembly of machinery, plumbing, wiring or other parts of said vessel are not covered in this report and deficiencies not noted may exist.

To the best of the inspector's knowledge and belief, all statements in this report are true and correct and the inspector has not knowingly withheld any information. No liability can be accepted for errors or omissions which may have occurred.

This report has been issued in accordance with, and is subject to, the requirements of the Code of Professional Ethics with which the inspector is affiliated.

Mr. Courtney Lange, BSc, MRINA, MNI
*Naval Architect*
*Tsunami Marine Limited*

# GENERAL DESCRIPTION

The barge was of all welded construction and of typical open deck cargo carriage configuration. The internal sub-division consisted of three (3) longitudinal and five (5) transverse watertight bulkheads resulting in twenty four (24) individual watertight compartments. Each compartment was fitted with an 18" diameter single T-bolt flush hatch Towing pad eyes were located on port and starboard bow with adjacent closed chock fairleads. The deck was fitted with a 60m x 14.5m x 2.5m bin wall horizontally and vertically stiffened with flanged plate. Located at centreline aft was a 12m x 5m loading ramp raised and lowered by two (2) "Braden Winch Co." hydraulic tuggers. The hydraulic tuggers were powered by a skid mounted, John Deere 4-cylinder diesel engine with electric start and built-in fuel tank. The barge was outfitted with navigation light holders on both port and starboard bow, and one (1) starboard on centreline at stern. At the time of survey the barge was anchored via a rope connection to a fixed mooring in the Gulf of Paria. The vessels Secretariat and Guardian were moored alongside on starboard and port sides respectively, limiting full visibility of side shell plating. No underwater inspection was performed at time of survey and the barge was observed to have a mean draft of 0.75m on even keel which indicated minimal water ingress based on an assumed lightship data. (**See Annex 1 for photos**)

## TOWING BRIDLE

The towing arrangement consisted of padeyes located on port and starboard at bow with adjacent closed chocks and a 55T shackle with thirteen (13) links of 2" diameter stud link chain connected to each towing padeye. The towing pad eyes were severely corroded and port padeye distorted. The visible chain links of both bridle chains were also severely corroded including the joining shackle pin and several center studs were missing from the chain links on deck.  However, both bridle fairleads were partly corroded but in satisfactory condition. The centreline padeye was fitted with a 55T shackle and a 2" diameter emergency tow wire threaded through the centerline fairlead and clipped along the starboard deck edge. The emergency towing wire was also moderately corroded and the lengths of towing bridle chains and tri-plate connection that have been submerged for more than 1year and should be considered for replacement. (**See Annex 2 for photos**)

**GENERAL CONDITION: Immediate maintenance required.**

## MAIN DECK

Inter-frame deformation was evident throughout the main deck with average deflection and wash boarding measuring 4cm. The main deck protective coating was non-existent and minor remnants of previous cargo evident. As a result of weathering and no apparent recent maintenance of all 8 strakes of plating, moderate surface corrosion was evident throughout and deck impressions of transverse bulkheads visible. The perimeter of the main deck was outfitted with a steel welded bin wall which was found mostly uncoated. Port and starboard bow navigation lights were outfitted forward on stanchions atop the bin wall however both stanchions were found with severe corrosion and wastage. A stern light stanchion was also provided on the starboard side of the aft ramp and anchor day shape on the fore deck. All navigation lights, screens and photo cell units were found in place. (See Annex 3 for photos)

**GENERAL CONDITION: Fair**



## FORWARD RAKE AND TRANSOM PLATING

The external hull coating in these areas was estimated to be 60% depleted and found with no significant indents, however, rust staining and minor corrosion was evident throughout. **(See Annex 4 for photos)**

**GENERAL CONDITION: Fair**


## FORWARD AND AFT DECKS

These areas were located forward and aft of the bin walls. The protective coating was 50% depleted with minor corrosion evident but without deformation or wash boarding. The fore deck contained the anchor mooring rope, the tail of the emergency tow wire and towing bridle arrangements whereas the aft deck was outfitted with a hinged cargo access ramp, hydraulic tugger winches and a tank and engine mounted on a containment skid. The engine was considered to require general servicing however hydraulic fittings were in satisfactory condition. No obvious defects were observed on the stern ramp hinges and supporting Sampson posts however, all vehicle anti-skid arrangements on the ramp were damaged. A severe indentation approximately 1m in length with an indentation of depth greater than 5cm at mid span was observed on port side aft 3m forward of the mooring bollard. **(See Annex 5 for photos)**

**GENERAL CONDITION: Fair**


## STARBOARD HULL CONDITION

The starboard side shell plating was noted to have several indents in numerous locations above the waterline varying in maximum deflection between 1cm - 4cm. Additionally, several areas of plating were wash boarded and with deflections at mid span of an average depth of 3cm. The upper rub rail was observed to have multiple indents of varying sizes and deformation with a maximum depth of 5cm. The lower rub rail was also observed to have multiple indents and deformation throughout with an average depth of 4cm and two vertical weld cracks. The protective paint coating of plating and rub rails was assessed as being 60% depleted with rust staining visible throughout. **(See Annex 6 for photos)**

**GENERAL CONDITION: Fair**


## PORT HULL CONDITION

The port side shell plating was noted to have several indents in numerous locations above the waterline varying in maximum deflection between 2cm - 5cm. Additionally, several areas of plating were wash boarded and with deflections at mid span with an average depth of 3cm. The upper rub rail was observed to have multiple indents of varying sizes and deformation with a maximum depth of 5cm. The lower rub rail was also observed to have multiple indents and deformation throughout with an average depth of 5cm and one vertical weld crack. The protective paint coating of plating and rub rails was assessed as being 65% depleted with rust staining visible throughout. **(See Annex 6 for photos)**

**GENERAL CONDITION: Fair**

## HEAD LOG

Head log plating found dented, deformed and wash boarded with a maximum deflection of 5cm throughout with the severest indents noted in way of wrap around areas for port and starboard side shell plating.

**(See Annex 6 for photos)**

**GENERAL CONDITION: Fair**


## ANCHORING AND MOORING EQUIPMENT

The vessel was not outfitted with anchors or an anchor windlass however, the towing bridle was attached by shackles onto bow pad eyes and bridle chains draped into the water via port and starboard bow fairleads. The barge was anchored using the towing bridle leading forward. Mooring bollards were outfitted on port and starboard bow shoulders and port and starboard aft quarters. All mooring bollards were found with moderate corrosion evident on foundations. Four sets of mooring cleats were provided equidistantly along port and starboard sides. All mooring cleats were also observed to have moderate corrosion evident.

**(See Annex 7 for photos)**

**GENERAL CONDITION: Fair**


## MANHOLE COVERS

The vessel had manhole covers outfitted inboard and outboard of the cargo bin walls. No physical damages were noted for the hatches however, all sealing mechanisms were considered 50% degraded and with moderate corrosion evident. No tanks were opened and prepared for internal inspection at time of survey.

**(See Annex 8 for photos)**

**GENERAL CONDITION: Fair**


## BINWALLS AND GUARD RAILS

The barge was outfitted with a 3m high bin wall extending throughout the vessel's perimeter approximately 2m inboard of the side shell with the only opening being in way of the aft cargo ramp. The bin wall consisted of two strakes of plating supported by outboard angular stanchions and mid span framing. The outboard side of the port and starboard bin walls were severely corroded with knife edge plating evident throughout however no holes due to wastage were noted. The inboard face of the port and starboard bin walls exhibited moderate corrosion on the lower strake of plating and 80% depletion of coating on the upper strake. A 5ft crack was found on bin wall plating on the port side 30ft from stern at mid height and a severe indentation due to overhead impact forward of amidships on the starboard side. **(See Annex 9 for photos)**

**GENERAL CONDITION: Poor**

## INTERNAL CONDITION OF TANKS

No tanks were prepared for internal inspection at time of survey therefore the following damages noted in surveys conducted for On and Off Hire Charter purposes 1year previous was considered to have remained unchanged and without maintenance.

### Port Bow Rake

- ➢ Hatch chain adrift.
- ➢ Rake plating deformed in aft bay between bottom longitudinals #1 and #2.
- ➢ Rake knuckle indented in two (2) areas ust forward of side chord #3.
- ➢ Rake knuckle indented in way of side chord #2.
- ➢ Side longitudinal #2 bowed in bays #2 and #3.
- ➢ Side longitudinal #1 bowed in bays #1 and #2.

### Port Inboard Bow Rake

- ➢ No noticeable damage.

### Starboard Bow Rake

- ➢ Side chord #4 bowed over the full height.
- ➢ Bottom chord #4 distorted outboard.
- ➢ Side chord #3 distorted over the full height.
- ➢ Side chord #2 deformed at side longitudinal #3 and #2
- ➢ Rake knuckle indented midway of bay #2.
- ➢ Side longitudinal #2 distorted in bay #2.

### Starboard Inboard Bow Rake

- ➢ Hatch chain adrift.
- ➢ No noticeable damage.

### Starboard #1

- ➢ Side longitudinals #4-6 bowed in bay #2.
- ➢ Side chord #2 deformed.
- ➢ Bottom plating indented in bay #3.
- ➢ Side longitudinals #2, #4, & #5 bowed in bay #4.
- ➢ Side chord #4 distorted.
- ➢ Side longitudinals #2, #3, #5 and #6 bowed in bay #5.

### Starboard #2

- ➢ Side longitudinals #3-5 bowed in bay #1.
- ➢ Side chord #1 distorted over the full height.
- ➢ Side longitudinals #4-6 bowed in bay #3.
- ➢ Bottom longitudinal #1 from starboard distorted in bay #3.
- ➢ Aft corner bracket #1 distorted.
- ➢ Side chord #4 bowed over the full height

### Starboard #3

- ➢ Side longitudinal #4 bowed in bay #1.
- ➢ Side chord #1 bowed.
- ➢ Side longitudinal #5 bowed in bay #3.
- ➢ Side longitudinals #3-5 bowed in the aft bay



### Starboard #4

➢ Side chord #1 bowed over the full height.
➢ Side chord #3 distorted over the full height.
➢ Side longitudinals #1 and 6 bowed in bay #4.
➢ Side chord #5 bowed over the full height.

### Starboard Outboard Transom

➢ Hatch chain adrift.
➢ Side longitudinal #2 bowed in bay #1.
➢ Side longitudinal #3 bowed in bay #1.
➢ Side longitudinals #2 and #4 bowed aft.

### Starboard Inboard Transom

➢ Hatch chain adrift.
➢ Forward deck brackets #3-5 distorted.
➢ Horizontal transom stiffener #3 bowed over its width

### Port Outboard Transom

➢ Hatch chain adrift.
➢ Forward bulkhead distorted outboard.
➢ Bottom plating set indented in way of side chord #1.
➢ Side longitudinal #2 bowed in bay #3.
➢ Side chord #4 bowed over the full height.
➢ Side longitudinals #2-4 distorted in the aft bay.

### Port Inboard Stern Transom

➢ Hatch chain adrift.
➢ Forward deck brackets #2 and #3 distorted.
➢ Forward bulkhead distorted over the full height between bottom longitudinals #3 to #6.

### Port #1

➢ Hatch chain adrift.
➢ Side chords #1-5 distorted over the full height.
➢ Side longitudinals #1, #2 & #4 bowed in bay #1.
➢ Side longitudinals #1, #2, #5, & #6 bowed in bay #2.
➢ Side longitudinals #4-6 distorted in bay #3.
➢ Side longitudinal #5 bowed in bay #4.

### Port #2

➢ Side longitudinal #2 bowed in bays #2 and #3.
➢ Side longitudinal #5 bowed in bay #2.
➢ Side longitudinal #5 bowed in bay #3.
➢ Side chords #2-4 bowed full height.
➢ Side longitudinal #1 bowed in aft bay.

### Port #3

➢ Side longitudinals #1-3 and #6 bowed in bay #1.
➢ Side longitudinal #5 bowed in bay #2.
➢ Side chord #4 bowed over its full height.
➢ Side longitudinal #5 bowed in bay #4.
➢ Side longitudinals #1, #5 and #6 bowed in bay #5.



- ➢ Side chord #5 crimped over the upper half.
- ➢ Aft corner bracket #1 distorted.
- ➢ Side longitudinal #2 bowed in the aft bay.
- ➢ Aft corner bracket #1 distorted.

### Port #4

- ➢ Hatch chain adrift.
- ➢ Deck longitudinals #1 & #2 bowed in bay #2.
- ➢ Side chord #2 crimped just above side longitudinal #2.
- ➢ Bottom plating set indented in bays #1, #3, and #4.
- ➢ Side longitudinals #2 and #4 bowed in bay #4.
- ➢ Side chord #4 bowed over the full height.
- ➢ Side longitudinals #2 and #6 bowed in the aft bay.
- ➢ Aft corner bracket #2 distorted.
- ➢ Access ladder wasted and broken 3m from main deck level.

### Port 1 Inboard

- ➢ Hatch chain adrift.
- ➢ No noticeable distortions.

### Starboard Inboard #1

- ➢ Bottom chords #2, 3, and 4 broken at bottom longitudinal #1

### Port Inboard #2

- ➢ Bottom chords 1, 3 and 4 broken at the outboard edge of bottom longitudinal #1

### Starboard Inboard #2

- ➢ No noticeable damage.

### Port Inboard #3

- ➢ Hatch chain adrift.
- ➢ Bottom chord #2 distorted.

### Starboard Inboard #3

- ➢ No noticeable damage

### Port Inboard #4

- ➢ Bottom longitudinal #1 bowed 0-¾" in bay #1 with bottom bracket affected

### Starboard Inboard #4

- ➢ Hatch chain adrift.
- ➢ No noticeable damage.

"JMC 50"                                                    Condition & Valuation Survey Report - Rev 0

## PLATING DAMAGE

Two areas of damaged plating with temporary repairs were identified during the inspection as follows:

- ❖ Starboard side shell plating sharply indented over an area 0.3m x 1m located just below upper rub rail in the 3rd vertical bay ending with punctured plating which was internally welded.
- ❖ Bottom hull plating doubler noted in Bay 2 from forward at bottom of vertical support on starboard side.

# REPORT ATTACHMENTS

- ANNEX 1: General Photographs

- ANNEX 2: Towing Bridle Photographs

- ANNEX 3: Main Deck Photographs

- ANNEX 4: Rake and Transom Photographs

- ANNEX 5: Forward and Aft Deck Photographs

- ANNEX 6: Head-log Port & Starboard Plating Photographs

- ANNEX 7: Mooring Equipment Photographs

- ANNEX 8: Manhole Covers Photographs

- ANNEX 9: Bin Walls Photographs

- Annex 10: USCG Certificate of Documentation and ABS Survey Status Report



# ANNEX 1
## General Photographs













# ANNEX 2
## Towing Bridle Photographs

















# ANNEX 3
## Main Deck Photographs













# ANNEX 4
## Rake and Transom Photographs










# ANNEX 5
## Forward and Aft Deck Photographs

































# ANNEX 6
# Head-log Port & Starboard Plating Photographs











# ANNEX 7
## Mooring Equipment Photographs
















# ANNEX 8
## Manhole Covers Photographs















# ANNEX 9
## Bin Walls Photographs



































# TSUNAMI MARINE

NAVAL ARCHITECTURE, MARINE CONSULTANTS & SHIP SURVEYORS

# INVOICE

#5 De Lima Road, Cascade,
Trinidad, West Indies

Tel: (868) 621-3016 * Fax: (868) 621-0014
Email: queries@tsunamimarine.com

**Date : 17th June 2020**
**Invoice No. : TSU/20/163**

V.A.T. REG. NO.: 118931

CLIENT: N.D. ALFONSO & CO.
          Suite 5 Chancery Courtyard,
          13-15 St. Vincent Street,
          Port of Spain
ATTEN:  ACCOUNTS DEPARTMENT
      cc. MS. NYREE D. ALFONSO (Attorney-at-Law)

Job No.:        TSU-20-0247
VESSEL:        JMC 50
PAYMENT TERMS: **Upon receipt of invoice**
Flag:  USA
Date of Survey:  17th May 2020
Location:        Chaguaramas

| ITEM | DESCRIPTION | AMOUNT COD |
|------|-------------|------------|
|      |             | TT $ |
| 1.   | For performance of an Off Hire Survey for vessel JMC 50 on behalf of Cashman Equipment Corporation to establish vessel's condition before coming Off Hire: | $ 12,500.00 |

*TT 12,500 x USD 1849.00*

|  |  |
|--|--|
| NON-VATABLE SUB TOTAL : | $ 12,500.00 |
| 12.5% VAT : | $ 0.00 |
| TOTAL : | TT $ 12,500.00 |

TSUNAMI MARINE LIMITED

**EXHIBIT**

**7**

Ver 3, 29/01/16

8/5/2020

Preview International Wire Payment

Logo

6                                                             7

# Preview International Wire Payment
Use this page to preview an International Wire payment.

## Payment Information

Help ?

**Debit Account**
Cashman Equipment Corp - 8257899333

**Debit Amount**
$1,849.00

**Credit Currency**
USD

**Credit Amount**
1,849.00USD

**Value Date**
08/05/2020

**Send Date**
08/05/2020

**Frequency**
One-Time Only

**Sender's Reference**
TSU 20 163

**Details of Payment**
INSPECTION OF BARGE FOR RENTAL

## Routing Instructions

**Recipient**
TSUNAMI MARINE LTD
Account Number 4010857
5 DE LIMA ROAD CASCADE
PORT OF SPAIN
TRINIDAD

**Recipient Bank**
SCOTIABANK TRINIDAD AND TOBAGO LTD.
SWIFT (international) NOSCTTPSXXX
SCOTIA CENTRE
PARK AND RICHMOND STREETS
PORT OF SPAIN TRINIDAD AND TOBAGO

**Intermediary Bank**

**Receiving Bank**

## Options

**From:** Dan Schwall
**Sent:** Monday, November 22, 2021 6:45 PM
**To:** Ray Riddle
**Subject:** FW: Tow of JMC 50 (220' x 60' x 14') from Port of Spain Trinidad to Amelia, LA

FYI:

**From:** Ivy Danos <idanos@crosbytugs.com>
**Sent:** Monday, November 22, 2021 5:22 PM
**To:** Dan Schwall <dschwall@4barges.com>
**Cc:** Kurt Crosby <kurt@crosbytugs.com>; Buddy Cantrelle <bcantrelle@crosbytugs.com>
**Subject:** RE: Tow of JMC 50 (220' x 60' x 14') from Port of Spain Trinidad to Amelia, LA

Dan

We would like to offer a lump sum of 780,000.00 to tow the JMC 50 from Trinidad to Amelia. Any delays out of the 24 hrs. in Trinidad will be bill at 950.00 per hr.

Ivy Danos
Crosby Tugs LLC

**From:** Kurt Crosby <kurt@crosbytugs.com>
**Sent:** Monday, November 22, 2021 3:22 PM
**To:** Ivy Danos <idanos@crosbytugs.com>
**Subject:** Fwd: Tow of JMC 50 (220' x 60' x 14') from Port of Spain Trinidad to Amelia, LA


Sent from my iPhone

Begin forwarded message:

> **From:** Dan Schwall <dschwall@4barges.com>
> **Date:** November 22, 2021 at 3:20:22 PM CST
> **To:** Kurt Crosby <kurt@crosbytugs.com>
> **Subject: Tow of JMC 50 (220' x 60' x 14') from Port of Spain Trinidad to Amelia, LA**


Kurt,

1

**EXHIBIT**

**8**

We are looking for a quote to tow the subject barge from Trinidad back to Amelia.

Barge will be empty for the tow.

Tow is being scheduled for February / March time frame.

Please quote with 24 hours free time in Trinidad.

Attached please find a spec sheet with GA for the JMC 50.

Please let me know should you have any questions.

Thanks and best regards,

Dan Schwall
Mobile: +1-206-310-5664

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.



**AARON LUKKEN**

Attorney, Managing Member

+1.816.683.7900
*lukken@vikinglaw.us*
6525 Charlotte Street
Kansas City, MO 64131 USA

July 21, 2021

Scott Brownell
Scott D. Brownell, APLC
527 E. Boston St., Suite 201
Covington, LA 70433

**Re:  Service in the British Virgin Islands**

Dear Scott:

Many thanks for contacting me yesterday afternoon regarding service on your defendants in the British Virgin Islands in the *Cashman Equipment Corp.* matter.  As you know, service in the islands **must** be effected pursuant to the Hague Service Convention (HSC) and the United Kingdom's declarations thereto, but that technically provides three options:  Central Authority, private process server, or mail.  I heartily recommend against mail service, especially during the coronavirus pandemic.

The timeframes I indicate below do not contemplate Covid-19 delays, but I do not anticipate significant problems—at least for the moment.  Costs and time *expectations* with contingencies for solely the entity and the three individuals in addition:

**Method 1:  Request to Central Authority**, Article 5, est. 4-5 months to proof [1]

| | |
|---|---|
| Preparation of Hague request forms and dispatch to the Central Authority:  $900 first defendant/case, $800 each add'l | $3,300 |
| Printing & shipping | $200 |
| **Due in advance** *(one defendant)* | $1,100 |
| **Due in advance** *(four defendants)* | $3,500 |

**Method 2.  Personal service via process server**, Article 10(b), 3 weeks to proof     *(Recommended)*

| | |
|---|---|
| Service via **process server**, *instructed by a solicitor*:  $1,800 first defendant/case, ~~$1,600~~ each add'l ($1,400 at same address) | ~~$6,600~~ $6,000 |
| Printing by solicitor [2] | *Waived* |
| **Due in advance** *(one defendant)* | $1,800 |
| **Due in advance** *(four defendants)* | $6,000 |

---

[1] Note the safe harbor provided by Rule 4(m): rather than a 90-day deadline, a reasonable diligence standard applies.
[2] Presumes fewer than 100 pages to serve.  ***Proof is provided in PDF format only.***

*Brownell BV...*

**EXHIBIT**

**9**

This engagement is not effective until we have received: (1) Pre-payment via check, ACH, or wire transfer; (2) a copy of this engagement letter, _countersigned by **counsel**_, either in hard copy or PDF; (3) issued summonses and any additional documents required by D. Mass. Local rules; and (4) definitive instruction as to whether we should target only the company or also the individual directors at the company address.  Terms and conditions are attached as an addendum to this engagement and incorporated herein.[3]  As always, I am happy to answer whatever additional questions you may have, and I look forward to working with you.

My warmest regards,

Aaron Lukken, Managing Member
Viking Advocates, LLC

ADL/

Agreed and accepted by:

_Scott Brownell_        7/18/21
(Signature & date)

_Scott Brownell, Managing Member_
(Printed name and title)
**for Scott D. Brownell, APLC**

Wire/ACH instructions:

| | |
|---|---|
| Receiving Bank: | //FW101015101 [BOK Financial] |
| ABA Routing: | 101015101 |
| SWIFT Code: | BAOKUS44 |
| Beneficiary Account Number: | 4041521 |
| Beneficiary Name: | Viking Advocates LLC |
| Beneficiary Address: | 6525 Charlotte Street |
| | Kansas City, MO 64131-1106 |
| Reference for Beneficiary: | Brownell BVI 2021-07-21 |

[3] _Viking Terms 2020-12-01.pdf_